1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11   JAMES P. CHASSE, JR., et al., )
                                   )
12              Plaintiffs,        )
                                   )    No.  CV-07-189-HU
13         v.                      )
                                   )
14   CHRISTOPHER HUMPHREYS, et al.,)    OPINION & ORDER
                                   )
15              Defendants.        )
     ──────────────────────────────)
16

17   Tom Steenson
     STEENSON, SCHUMANN, TEWKSBURTY, CREIGHTON & ROSE, P.C.
18   500 Yamhill Plaza Building
     815 S.W. Second Avenue
19   Portland, Oregon 97204

20       Attorney for Plaintiffs

21   James G. Rice
     DEPUTY CITY ATTORNEY
22   David A. Landrum
     DEPUTY CITY ATTORNEY
23   OFFICE OF CITY ATTORNEY
     1221 S.W. Fourth Avenue, Room 430
24   Portland, Oregon 97204

25       Attorneys for City Defendants

26   / / /

27   / / /

28   / / /

1 - OPINION & ORDER

Agnes Sowle
COUNTY ATTORNEY
Susan M. Dunaway
ASSISTANT COUNTY ATTORNEY
501 S.E. Hawthorne Blvd., Suite 500
Portland, Oregon 97214-3587

    Attorneys for Bret Burton & Multnomah County

James P. Martin
Kari A. Furnanz
HOFFMAN HART & WAGNER, LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205

    Attorneys for Sokunthy Eath & Patricia Gayman

James L. Dumas
Sheri C. Browning
LINDSAY, HART, NEIL, & WEIGLER LLP
1300 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97201

    Attorneys for AMR Defendants

KING, District Judge:

    In this civil rights action, plaintiffs bring several claims against various groups of defendants, including the City Defendants (Humphreys, Nice, City of Portland, Tri-Met, Potter & Sizer), the County Defendants (Burton & Multnomah County), the County Nurses (Eath & Gayman), and the AMR Defendants (AMR, Stucker, and Hergert). The claims arise from a September 17, 2006 incident in which James P. Chasse, Jr., died in police custody.

    Presently, the County Defendants move to dismiss Mark Chasse as a plaintiff in the Fourth Claim for Relief, and move to dismiss plaintiffs' 42 U.S.C. §§ 1985(3) and 1986 claims. The County Defendants further move to strike certain allegations from the Amended Complaint. The City Defendants make an identical motion in regard to Mark Chasse's presence in the Fourth Claim for Relief. The City Defendants also move to dismiss the section 1985 and 1986

2 - OPINION & ORDER

claims, as well as all claims against defendant TriMet.  Finally, the City Defendants move to dismiss a portion of the Seventh Claim for Relief and the injunctive relief claim.

I grant the County Defendants' motion to dismiss and deny the motion to strike.  I grant in part and deny in part the City Defendants' motion.

STANDARDS

On a motion to dismiss, the court must review the sufficiency of the complaint.  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).  All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  <u>American Family Ass'n, Inc. v. City & County of San Francisco</u>, 277 F.3d 1114, 1120 (9th Cir. 2002).

A motion to dismiss under Rule 12(b)(6) will be granted only if plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions and a formulaic recitation of the elements of a cause of action[.]"  <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964-65 (2007) (internal quotation omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]"  <u>Id.</u> at 1965 (citations and internal quotations omitted).

I.  County Defendants' Motion to Dismiss

A.  Mark Chasse as Plaintiff in Fourth Claim

Mark Chasse is a plaintiff in the case individually, as well as appearing as the Personal Representative of the estate of his brother, James P. Chasse, Jr.  In the Fourth Claim for Relief,

3 - OPINION & ORDER

1  brought under 42 U.S.C. § 1983, plaintiffs allege that conduct of

2  Humphreys, Nice, Burton, Gayman, Eath, Hergert, and Stucker,

3  violated plaintiffs' Fourteenth Amendment rights because the

4  conduct was unreasonable or so arbitrary that it shocks the

5  conscience. Am. Compl. at ¶ 99.

6      Plaintiffs further allege that the policies, practices, or

7  acts of the City, the County, and AMR, and their officials, make

8  those entities liable for the violation of plaintiffs' Fourteenth

9  Amendment rights. Id. at ¶ 100. They also allege that the

10 ratification of employee conduct by the City, the County, and AMR

11 makes them liable for the violation of the Fourteenth Amendment as

12 described in the claim. Id. at ¶ 101.

13     Plaintiffs seek non-economic and punitive damages, as well as

14 attorney's fees. Id. at ¶¶ 102 - 104. Particularly, plaintiffs

15 James P. Chasse (father of James P. Chasse, Jr.), Linda Gerber

16 (mother of James P. Chasse, Jr.), and Mark Chasse (individually),

17 contend that as a result of defendants' conduct which was so

18 unreasonable and so arbitrary that it shocks the conscience, they

19 have suffered and continue to suffer stress, anxiety, mental

20 trauma, pain, and suffering. Id. at ¶ 72.

21     The County Defendants move to dismiss Mark Chasse as a

22 plaintiff in this claim because, they contend, a sibling is not a

23 proper party. I agree.

24     In Ward v. City of San Jose, 967 F.2d 280 (9th Cir. 1992), the

25 Ninth Circuit considered whether parents and siblings of the

26 deceased victim of a police shooting could maintain section 1983

27 excessive force and substantive due process claims against the

28 City, its Chief of Police, and individual officers. The court

4 - OPINION & ORDER

1   concluded that while the parents had a constitutionally protected
2   liberty interest in the companionship and society of their child,
3   the siblings did not.  Id. at 283.  Relying on an earlier Ninth
4   Circuit case, Smith v. City of Fontana, 818 F.2d 1411 (9th Cir.
5   1987), and a Seventh Circuit case, Bell v. City of Milwaukee, 746
6   F.2d 1205 (7th Cir. 1984), the Ninth Circuit held that "[n]either
7   the legislative history nor Supreme Court precedent supports an
8   interest for siblings consonant with that recognized for parents
9   and children."  Id. at 284.

10      Plaintiffs argue that Ward is not controlling here because it
11  is distinguishable or is no longer good law.  Plaintiffs contend
12  that reliance on Ward is "misplaced" because Ward was not a "shocks
13  the conscience" Fourteenth Amendment claim.  Ward was, however, a
14  substantive due process claim, as is plaintiff's Fourth Claim for
15  Relief.  As made clear in County of Sacramento v. Lewis, 523 U.S.
16  833 (1998), while negligently inflicted harm cannot support a
17  substantive due process claim under section 1983, "conscience-
18  shocking" conduct, noted as "behavior at the other end of the
19  culpability spectrum," does support such a claim.  Id. at 848-49.

20      The "shocks the conscience" standard is a standard of fault
21  that must be shown to support plaintiffs' substantive due process
22  claim.  It is not a separate type of constitutional claim.  Ward is
23  not distinguishable.

24      Because Ward is controlling, I need not address plaintiffs'
25  alternative argument that Ward was wrongly decided and is of
26  questionable precedent.  This Court is bound by controlling
27  decisions of the Ninth Circuit.  Plaintiffs' arguments as to the
28  continued validity of Ward are better addressed to the Ninth

5 - OPINION & ORDER

1  Circuit.

2      The County's motion to dismiss plaintiff Mark Chasse in his

3  individual capacity from the Fourth Claim for Relief, is granted.

4      B.  42 U.S.C. § 1985 Claim

5      In their Sixth Claim for Relief, plaintiffs allege that

6  Humphreys, Nice, Burton, and others acted together to deprive James

7  P. Chasse, Jr. of his Fourteenth Amendment equal protection rights

8  because of his known or perceived mental illness. Am. Compl. at ¶

9  113.  The County Defendants move to dismiss this claim on the basis

10 that the mentally ill are not a protected class for section 1985

11 purposes.  I agree with the County Defendants.

12     Plaintiffs bring the claim under section 1985(3) which

13 prohibits a conspiracy to deprive "any person or class of persons

14 of the equal protection of the laws[.]"  42 U.S.C. § 1985(3).

15 While the law was originally intended to protect against race

16 discrimination, it has been extended "to protect non-racial

17 groups." Holgate v. Baldwin, 425 F.3d 671, 676 (9th Cir. 2005).

18 Such protection applies, however, "only if the courts have

19 designated the class in question a suspect or quasi-suspect

20 classification requiring more exacting scrutiny or Congress has

21 indicated through legislation that the class requires special

22 protection." Id.  (internal quotation, ellipsis, and brackets

23 omitted).

24     The County Defendants argue that the section 1985(3) claim

25 must be dismissed because there is no Supreme Court or Ninth

26 Circuit case recognizing the mentally ill or disabled individuals

27 as a class protected by section 1985(3).  First, the County

28 Defendants cite to City of Cleburne v. Cleburne Living Center, 473

6 - OPINION & ORDER

U.S. 432, 440 (1985), which held that the mentally disabled are not a suspect or quasi-suspect class for purposes of equal protection claims.  Next, the County Defendants cite to cases from the Fifth, Sixth, Seventh, and Tenth Circuits which declined to expand the protected class to include mentally disabled individuals for section 1985(3) purposes.  County Defts' Mem. at pp. 5-6 & n.2 (citing Bartell v. Lohiser, 215 F.3d 550, 559 (6th Cir. 2000) (plaintiff had no actionable section 1985 claim because statute does not cover claims based on disability-based discrimination or animus); Newberry v. East Texas State Univ., 161 F.3d 276, 281 n.2 (5th Cir. 1998) (noting that law in Fifth Circuit remained that racial animus was the only basis for section 1985(3) claim and rejecting claim based on disability); D'Amato v. Wisconsin Gas Co., 760 F.2d 1474, 1486 (7th Cir. 1985) (noting that the legislative history of section 1985(3) "does not suggest a concern for the handicapped"); Wilhelm v. Continental Title Co., 720 F.2d 1173, 1176-77 (10th Cir. 1983) (even if handicapped persons could be identified as a class, class would not be protected under section 1985(3))).

In response, plaintiffs note that in the Ninth Circuit, section 1985(3) protection extends to suspect classes or quasi-suspect classes beyond race when "Congress has indicated through legislation that the class required special protection." Holgate, 425 F.3d at 676.  Plaintiffs further note that several of the cases the County Defendants rely on were decided before the passage of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA").  Plaintiffs contend that the passage of the ADA elevated the disabled, including the mentally ill, to a suspect or quasi-

1  suspect class.

2      There is no doubt that in enacting the ADA, Congress addressed
3  what it expressly recognized as the historic segregation and
4  persistent discrimination of persons with disabilities.  This is
5  demonstrated by the Congressional findings underlying the passage
6  of the ADA which refer to, inter alia:  (1) the number of Americans
7  possessing one or more physical or mental disabilities; (2) the
8  fact that historically, society has isolated and segregated
9  individuals with disabilities;  (3) persistent discrimination
10 against individuals with disabilities in several sectors of society
11 such as employment, housing, health services, etc.; and (4) the
12 inferior status occupied by people with disabilities.  42 U.S.C.
13 12101(a).  At the time of enactment, Congress also recognized the
14 disabled as "a discrete and insular minority who have been faced
15 with restrictions and limitations, subjected to a history of
16 purposeful unequal treatment, and relegated to a position of
17 political powerlessness in our society[.]"  Id.[1]

18     Congress also expressly cited the purposes of the ADA as to
19 provide a national mandate to eliminate discrimination against
20 individuals with disabilities, to provide enforceable standards
21 addressing such discrimination, to ensure the federal government
22 played a central role in enforcing the standards established in the
23 law, and to "invoke the sweep of congressional authority, including
24 the power to enforce the fourteenth amendment and to regulate
25 commerce in order to address the major areas of discrimination

26

27        [1]  The ADA Amendments Act of 2008 has stricken paragraph
    (a)(7) from the statute, effective January 1, 2009.  Pub. L. No.
28  110-325, 122 Stat. 3553 (2008).

8 - OPINION & ORDER

1  faced day-to-day by people with disabilities."   42 U.S.C. §
2  12101(b).

3      Although the ADA, and specifically, these Congressional
4  findings and identified purposes, make clear that protection of the
5  disabled from discrimination in employment, public services, and
6  public accommodation, was necessary to eradicate historical
7  segregation and discrimination, nothing in the statute or the
8  findings and purposes suggests that the disabled as a group
9  generally, were to be viewed as a suspect or quasi-suspect class
10 for equal protection or section 1985(3) purposes.

11      In fact, Supreme Court cases decided after the ADA's enactment
12 indicate that the Court adheres to its prior conclusion in Cleburne
13 that the disabled are not a suspect or quasi-suspect class in an
14 equal protection analysis.   First, as noted above, the Court in
15 Cleburne considered the question and squarely rejected it.   473
16 U.S. at 444-46.

17      Second, two more recent cases have upheld Cleburne's
18 conclusion, well after the 1990 enactment of the ADA.   In Board of
19 Trustees of the University of Alabama v. Garrett, 531 U.S. 356
20 (2001), the Court considered whether state employees could maintain
21 a Title I ADA employment action against the state in federal court
22 consistent with the Eleventh Amendment.   As part of its Eleventh
23 Amendment analysis, the Court first had to identify the scope of
24 the constitutional right at issue.   Id. at 365.   In that context,
25 the Court held that "the result of Cleburne is that States are not
26 required by the Fourteenth Amendment to make special accommodations
27 for the disabled, so long as their actions toward such individuals
28 are rational." Id. at 367.   The Court also recognized that "it is

9 - OPINION & ORDER

1  the responsibility of this Court, not Congress, to define the
2  substance of constitutional guarantees." Id. at 365.

3      In Tennessee v. Lane, 541 U.S. 509 (2004), the Court
4  confronted another Eleventh Amendment immunity question in an ADA
5  case.  There, the Court considered whether Title II of the ADA,
6  addressing the provision of public services, was an exercise of
7  Congress's enforcement power of the Fourteenth Amendment consistent
8  with the Eleventh Amendment.  Again, at the inception of its
9  analysis, the Court had to "identify the constitutional right or
10 rights Congress sought to enforce[.]"  Id. at 522.  The Court
11 continued to adhere to its conclusion in Cleburne, and in Garrett,
12 that "classifications based on disability violate [the]
13 constitutional command [of the Fourteenth Amendment] if they lack
14 a rational relationship to a legitimate governmental purpose." Id.

15     The Lane Court went on to discuss that in the case before it
16 where disabled persons alleged that they were denied access to the
17 courts because of their disabilities, the denial of the fundamental
18 due process right of court access required heightened scrutiny.
19 Id. at 528.  It is clear that the fundamental right of access to
20 the courts, and not the status of disabled individuals, triggered
21 an application of heightened scrutiny.

22     Although the Supreme Court has not expressly considered the
23 question of whether a section 1985(3) claim based on a physical or
24 mental disability is a viable claim, the Court has indicated, even
25 in the context of claims brought directly under the ADA, that
26 disabled persons are not a suspect class or quasi-suspect class for
27 equal protection claims.  In the absence of express, controlling
28 authority by the Supreme Court or the Ninth Circuit, Garrett and

1  <u>Lane</u> guide my conclusion that plaintiffs cannot sustain the claim
2  brought here.

3      Finally, at least one district court in the Ninth Circuit has
4  indicated that disabled persons are not a suspect class or quasi-
5  suspect class for purposes of a section 1985(3) claim.  <u>Rasmussen</u>
6  <u>v. City of Redondo Beach</u>, No. 2:07-cv-07743-FMC (PLA), 2008 WL
7  4450322, at *9 n.6 (C.D. Cal. Sept. 9, 2008).  While the court did
8  not discuss the precise issue plaintiffs raise here regarding the
9  ADA, it nonetheless dismissed a claim contending that the
10 defendants' animus toward injured or physically infirm persons
11 supported a section 1985(3) claim.  <u>Id.</u>

12     I agree with the County Defendants that plaintiffs cannot
13 base their section 1985(3) claim on the assertion that certain
14 defendants conspired to deprive James P. Chasse, Jr. of his rights
15 because he was mentally ill.  This claim is dismissed.

16     C.  42 U.S.C. § 1986 Claim

17     In their Sixth Claim for Relief, plaintiffs also bring a claim
18 under 42 U.S.C. § 1986, contending that one or more of the
19 defendants neglected or refused to prevent the deprivation of James
20 P. Chasse Jr.'s rights.  Am. Compl. at ¶ 113; <u>see</u> 42 U.S.C. § 1986
21 (providing for damages against persons who had knowledge of a
22 section 1985 conspiracy but neglected or refused to prevent its
23 occurrence).  Because I dismiss the section 1985 claim, I dismiss
24 the section 1986 claim.  <u>Karim-Panahi v. Los Angeles Police Dep't</u>,
25 839 F.2d 621, 626 (9th Cir. 1988) (holding that "[a] claim can be
26 stated under section 1986 only if the complaint contains a valid
27 claim under section 1985.").

28 / / /

11 - OPINION & ORDER

1  II.  County Defendants' Motion to Strike

2       The court may order stricken from any pleading any
3  insufficient defense or any redundant, immaterial, impertinent or
4  scandalous matter.  Fed. R. Civ. P. 12(f).  Granting a motion to
5  strike is within the broad discretion of the district court.
6  Stanbury Law Firm v. IRS, 221 F.3d 1059, 1063 (9th Cir. 2000).

7       The Ninth Circuit recognizes that "striking a party's
8  pleadings is an extreme measure[.]"  Id.  Accordingly, the court
9  has explained that "[m]otions to strike under Fed. R. Civ. P. 12(f)
10 are viewed with disfavor and are infrequently granted."  Id.
11 (internal quotation omitted).

12      The County Defendants move to strike paragraphs 4, 35, 38, 41,
13 and portions of paragraph 32 of the Amended Complaint.  They argue
14 that with the dismissal of the section 1985(3) and 1986 claims, any
15 allegations referring to a "cover up" are immaterial.  They further
16 contend that plaintiffs' section 1983 claim cannot support such
17 cover up allegations.  The County Defendants also move to strike
18 the introductory paragraphs of the Amended Complaint (paragraphs 1-
19 8), as being immaterial and redundant.

20      While some parts of some of these paragraphs may well be
21 immaterial or redundant, I decline to strike them at this point.
22 I do not find their continued presence in the Amended Complaint to
23 be prejudicial to the County Defendants.  If the purpose of the
24 County Defendants' motion is to limit admissibility of evidence
25 supporting these allegations at trial, the County Defendants may
26 address that issue in a motion in limine or as part of drafting the
27 Pretrial Order.  I deny the motion to strike.

28 / / /

12 - OPINION & ORDER

III.  City Defendants' Motion to Dismiss

    A.  Mark Chasse as Plaintiff in Fourth Claim

    Like the County Defendants, the City Defendants argue that Mark Chasse must be dismissed as a plaintiff in the Fourth Claim for Relief because siblings are not proper parties in a substantive due process section 1983 claim.  For the reasons discussed above, I agree with the City Defendants.  This claim is dismissed.

    B.  42 U.S.C. §§ 1985(3) and 1986 Claims

    The City Defendants move to dismiss the section 1985(3) claim because of plaintiffs' failure to allege facts in support of the conspiracy element of the claim.  Plaintiffs' opposition memorandum fails to respond to the City Defendants' argument.  I need not address it because, based on the discussion above in regard to the County Defendants' motion, even if plaintiffs adequately pleaded facts establishing a conspiracy, they cannot base the section 1985(3) claim on the assertion that certain defendants conspired to deprive James P. Chasse, Jr. of his rights because he was mentally ill.  This claim is dismissed, as is the derivative section 1986 claim.

    C.  Allegations as to TriMet

    In the caption of the Amended Complaint, plaintiffs name the "Tri-County Metropolitan Transportation District of Oregon" as a defendant.  In the section identifying the various parties, this defendant, referred to as "TriMet" is alleged to be a

> public body responsible under state law for the acts and omissions of its employees and other individuals selected and assigned to its Transit Police Division, including those whose conduct is at issue herein.  TriMet has entered into intergovernmental agreements with Portland, the County, and other jurisdictions, to have police officers and deputy sheriffs, such as Humphreys and

13 - OPINION & ORDER

> Burton, selected and assigned to work with the TriMet
> Transit Police Division ("Transit Police Division") and
> to provide transit police services. Portland, Multnomah
> County, other jurisdictions with police departments, and
> TriMet, work together and jointly decide which police
> officers and deputy sheriffs shall be selected and
> assigned to the Division. Supervision of police
> personnel for the daily operations of the Transit Police
> Division is provided by the division's command personnel.

Am. Compl. at ¶ 20. Additionally, plaintiffs allege that "[a]t all

material times, Humphreys and Burton had been selected and

assigned, respectively, by [the City of] Portland, Multnomah

County, and TriMet to the Transit Police Division. In that

capacity, they were agents of TriMet." Id. at ¶ 21.

The City Defendants contend that TriMet must be dismissed from

the case because plaintiffs fail to allege any violations of

federal or state law entitling them to relief against TriMet.

In response, plaintiffs point to the allegations quoted above,

as well the contention that

> [k]nowing or having reason to know what they did about
> Humphreys' propensity to use extreme, excessive, and
> brutal physical force against innocent citizens,
> Portland, Sizer, Potter, other Portland officials, and
> TriMet, were deliberately indifferent and/or negligent
> with regard to the well-established constitutional rights
> of Chasse and other innocent citizens, when Humphreys was
> selected and assigned by Portland and TriMet to the
> Transit Police Division to provide transit police
> service.

Id. at ¶ 57.

Plaintiffs also contend that "one or more of the policies,

official practices, and acts of . . . TriMet . . ., and their

respective officials, described in ¶¶ 48-65 above, was a cause of

Chasse's death." Id. at ¶ 66. Finally, plaintiffs point to their

Ninth Claim for Relief, a state law claim for wrongful death, in

which they contend that the City, the County, AMR, and TriMet were

14 - OPINION & ORDER

negligent and were "responsible for their negligence, the negligence of their employees, and other tortious conduct which caused the wrongful death of Chasse." Id. at ¶ 131.

The City Defendants state in their reply memorandum that TriMet is a mass transit district organized pursuant to Oregon statute, that TriMet does not have its own police force, and that while TriMet funds TriMet transit officers, those officers receive direction from their respective assigning agency. Given these facts, the City Defendants contend that TriMet should be dismissed.

The statements the City Defendants make in the reply memorandum are irrelevant to the resolution of a Rule 12(b)(6) motion. At this time, I consider only the allegations in the Amended Complaint. Moreover, the City Defendants' asserted facts, even if considered, do not, without more, negate certain key allegations in the Amended Complaint such as TriMet's alleged role in determining which officers are assigned to the Transit Division Police and Humphreys's and Burton's status as agents of TriMet. The Amended Complaint states a claim against TriMet. I deny this motion.

D.    Claim regarding Self-Evaluation Provisions of
      Disability Statutes

Plaintiffs' Seventh Claim for Relief is for discrimination based upon disability. There, plaintiffs bring claims under the ADA, the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796l, Oregon Revised Statute § (O.R.S.) 659A.142, and Portland City Ordinance 23.01.070. Part of the claim is based on plaintiffs' allegations that the City, the County, and AMR

> failed to evaluate their service policies and practices
> and the effects thereof that do not comply with federal

15 - OPINION & ORDER

anti-discrimination statutes pertaining to disability and/or modify their service policies and practices in order to comply with federal anti-discrimination statutes pertaining to disability.

Am. Compl. at ¶ 120. Plaintiffs also allege that these defendants failed to provide reasonable modification to their policies or practices to accommodate individuals with mental or psychological disabilities. Id. at ¶ 122.

The City Defendants contend that these allegations in support of the disability discrimination claim must be dismissed because plaintiffs do not have a private right of action to enforce the self-evaluation regulations of the ADA.[2]  I agree.

The parties agree there is no controlling Ninth Circuit authority. There is a split of authority among the other circuit courts which have considered the issue. Compare Iverson v. City of Boston, 452 F.3d 94 (1st Cir. 2006) (no private right of action to enforce Title II self-evaluation and transition plan regulations), and Ability Center of Greater Toledo v. City of Sandusky, 385 F.3d 901 (6th Cir. 2004) (no private right of action to enforce Title II transition plan regulation), with Chaffin v. Kansas State Fair Bd., 348 F.3d 850 (10th Cir. 2003) (plaintiffs had private right of action to challenge defendant's alleged failure to comply with self-evaluation and transition regulations under Title II). Additionally, two Judges in the Northern District of California

---

[2]  The City Defendants further contend that the "self-evaluation" claim cannot be based on O.R.S. 659A.142 and the pertinent Portland City Ordinance because those laws do not require a public entity to review or modify policies for disability law compliance.  In their opposition memorandum, plaintiffs concede this point and indicate that they never intended to argue that the state or city laws required self-evaluation.

16 - OPINION & ORDER

have followed the Sixth and First Circuits in finding no private action, Californians for Disability Rights, Inc. v. California Dep't of Transp., 249 F.R.D. 334 (N.D. Cal. 2008), Cherry v. City College of San Francisco, No. C04-04981 WHA, 2005 WL 2620560 (N.D. Cal. Oct. 14, 2005), while one judge in the Central District of California has followed the Tenth Circuit.  Lonberg v. City of Riverside, No. EDCV 97-00237-RT(AJWx), 2006 WL 4811345 (C.D. Cal. May 4, 2006).

The issue concerns whether the regulation invokes a private right of action created by Congress in Title II.  Under Title II Of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

The Attorney General has authority to promulgate regulations to implement Title II.   42 U.S.C. § 12134.   Pursuant to that authority, the Attorney General adopted 28 C.F.R. § 35.105 which provides that no later than July 26, 1992, a public entity must engage in a self-evaluation of its services, policies, and practices to identify whether any modifications to those services, policies, and practices are necessary to meet the statute's requirements.  28 C.F.R. § 35.105.[3]

---

[3]  It is unclear if plaintiffs' claim is limited to the self-evaluation regulation.  To the extent plaintiffs also rely on the transition regulation found at 28 C.F.R. § 35.150(d)(1) (requiring a public entity employing fifty or more persons to develop, within six months of January 26, 1992, a transition plan setting forth steps necessary to complete any structural changes undertaken by the public entity), I also conclude that there is

1    The leading Supreme Court case on the question of private

2  rights of action created by regulations is Alexander v. Sandoval,

3  532 U.S. 275 (2001). There, the Court discussed whether there was

4  a private right of action to enforce disparate-impact regulations

5  promulgated under Title VI of the Civil Rights Act of 1964. While

6  the holding of the Court is not relevant to the ADA claim here, the

7  Court's analysis is relied on by all of the circuit courts that

8  have considered the precise private right of action question

9  implicated in the instant claim.

10    In Sandoval, the Court noted that "private rights of action to

11  enforce federal law must be created by Congress." Sandoval, 532

12  U.S. at 286. Whether a statute provides for a private cause of

13  action depends on whether the statute demonstrates that it was

14  Congress's intent to create such a cause of action. Id.

15  Importantly, the Court recognized that "[l]anguage in a regulation

16  may invoke a private right of action that Congress through

17  statutory text created, but it may not create a right that Congress

18  has not." Id. at 291.

19    Justice Scalia explained that

20    when a statute has provided a general authorization for
     private enforcement of regulations, it may perhaps be
21    correct that the intent displayed in each regulation can
     determine whether or not it is privately enforceable.
22    But it is most certainly incorrect to say that language
     in a regulation can conjure up a private cause of action
23    that has not been authorized by Congress. Agencies may
     play the sorcerer's apprentice but not the sorcerer
24    himself.

25  Id. Thus, as the Ability Center court explained, "Sandoval makes

26  clear [] that a private plaintiff cannot enforce a regulation

27  _____

28  no private right of action for that claim.

18 - OPINION & ORDER

through a private cause of action generally available under the controlling statute if the regulation imposes an obligation or prohibition that is not imposed generally by the controlling statute." Ability Center, 385 F.3d at 906.  However, "if the regulation simply effectuates the express mandates of the controlling statute, then the regulation may be enforced via the private cause of action under that statute." Id.

All four cases cited above holding that there is no private right of action to enforce the self-evaluation and/or transition regulations of Title II, have concluded, following Sandoval, that the regulations "impose obligations on public entities different than, and beyond, those imposed by the ADA itself [and thus,] those regulations may not be enforced through the instrumentality of the private right of action available under Title II." Iverson, 452 F.3d at 102; see also Ability Center, 385 F.3d at 913-14 (transition plan regulation of section 35.150(d) imposes obligations not contemplated by Title II); Californians for Disability Rights, 249 F.R.D. at 342 ("neither regulation contains a clear Congressional intent to create a private right of enforcement"); Cherry, 2005 WL 2620560, at *3-4 (following Ability Center and concluding that self-evaluation and transition plan regulations went beyond requirements of statute).

These cases have looked at the regulations independently and analyzed the relationship between the regulations and Title II. The following passage from Iverson exemplifies the discussion by the like-minded courts:

> Nothing in the text of Title II requires public entities to conduct self-evaluations, let alone to do so by the date prescribed in the regulation.  Conducting a self-

19 - OPINION & ORDER

evaluation may well facilitate compliance with the
strictures of Title II-but a municipality's failure to
self-evaluate does not in and of itself render municipal
services, programs, or activities inaccessible to
disabled persons.  Put another way, it is altogether
conceivable that a public entity may be in full
compliance with Title II without observing the commands
of the self-evaluation regulation.

Iverson, 452 F.3d at 101.  Similarly, the Ability Center court, in

discussing the transition plan regulation, noted that while the

development of such a plan "may ultimately facilitate compliance

with Title II, [] there is no indication that a public entity's

failure to develop a transition plan harms disabled individuals,

let alone in a way that Title II aims to prevent or redress."

Ability Center, 385 F.3d at 914.  The court also noted that a

public entity could "fully satisfy" its accommodation obligations

imposed by Title II in the absence of a suitable transition plan.

Id.

The two Northern District of California cases, Cherry and

Californians for Disability Rights, have followed the reasoning of

First Circuit in Iverson and the Sixth Circuit in Ability Center,

while rejecting the position articulated by the Tenth Circuit in

Chaffin.  Both the Cherry and Californians for Disability Rights

courts concluded that the court in Chaffin erred in applying

Sandoval because Chaffin failed to engage in a separate analysis

for each regulation and instead, considered the regulations

collectively.  Californians for Disability Rights, 249 F.R.D. at

341-42 (rejecting Chaffin and concurring with the First and Sixth

Circuits because Sandoval directs a "regulation-by-regulation

analysis . . . to determine if each one exhibits a Congressional

intent to create a private right of enforcement); Cherry, 2005 WL

20 - OPINION & ORDER

2620560, at *3 n.* (noting that Chaffin did not engage in a separate analysis for each regulation in dispute; agreeing with the Sixth Circuit in Ability Center that "there is a distinction between regulatory violations that, by themselves, would deny the disabled meaningful access to public services and those that would not.").

I find the reasoning of the First and Sixth Circuits, followed by the two decisions from the Northern District of California, persuasive.  I agree with Iverson's conclusion that the "Chaffin court misconstrued Sandoval and, thus, the decision [in Chaffin] is simply incorrect."  Iverson, 452 F.3d at 101.

Finally, I am unconvinced by plaintiffs' argument that the presence of their claim of a substantive Title II violation distinguishes this case from Iverson, Ability Center, Cherry, and Californians for Disability Rights.  The fact that plaintiffs have brought a claim directly under Title II does not confer "private right of action" status on a claim alleging a violation of a regulation.  See, e.g., Iverson, 452 F.3d at 100 ("Under Sandoval, . . . a private plaintiff may not, merely by referencing the organic statute, enforce regulations that interdict a broader swath of conduct than the statute itself prohibits.").

I grant the City Defendants' motion to dismiss the portion of the disability discrimination claim based on the self-evaluation regulation.

E.  Injunctive Relief Claim

In their tenth claim, plaintiffs seek injunctive relief based on their 42 U.S.C. § 1983 claim.  Am. Compl. at ¶¶ 134-137.  There, they contend that the City, and its employees and officials, have

21 - OPINION & ORDER

failed and refused to do many things, including (1) implementing an "early warning" system to identify police officers with a history of a high use of force, (2) implementing a thorough, independent, and effective review system to investigate deaths of citizens as a result of police use of force, or in-custody deaths, (3) changing policy, practice, and training, to ensure that the mentally ill are treated fairly; (4) changing the Portland Police Bureau's "foot pursuit" policy; (5) changing the Portland Police Bureau's force policy to include certain conduct as deadly physical force; and (6) changing the Portland Police Bureau's policy so as to require probable cause of immediate risk of death or serious bodily injury before deadly physical force is to be used.  Id.

    The City Defendants contend that plaintiffs lack standing to bring the claim.  The City Defendants contend that because James P. Chasse, Jr. is deceased, plaintiffs cannot demonstrate that James P. Chasse, Jr. is immediately in danger of sustaining some direct injury as a result of the Portland Police Bureau's policies and training on interactions with mentally ill citizens, on the definition of deadly force, on foot pursuits, or on use of force. They also contend that plaintiffs cannot possibly show that (1) all police officers in the City always treat persons living with, or perceived to be living with, mental illness unfairly, pursue such persons by foot, and strike such persons in their chest or back; or that (2) the City ordered or authorized police officers to act in such a manner.

    The City Defendants previously moved for summary judgment against the injunctive relief claim in plaintiffs' original Complaint.  Although that claim used slightly different language,

1    the operative part of that claim is substantially identical to the

2    claim in the Amended Complaint.  Compare Compl. at ¶¶ 132-135 with

3    Am. Compl. at ¶¶ 134-137.

4    At the June 4, 2008 oral argument on the City Defendants'

5    earlier motion, I told the parties that I had serious doubts about

6    whether plaintiffs were going to be entitled to injunctive relief.

7    Transcript of June 4, 2008 Oral Arg. at p. 41 (Exh. A to Declr. of

8    Steenson filed in opposition to City Defendants' Motion to

9    Dismiss).  Citing City of Los Angeles v. Lyons, 461 U.S. 95 (1983)

10   (a case relied on by the City Defendants in support of the instant

11   motion to dismiss), I noted that plaintiffs here had a "heavy

12   burden to overcome[.]"  Id. at p. 42.  Nonetheless, I denied the

13   City Defendants' motion and indicated that they could renew it at

14   the appropriate time.  I explained that I saw no problem with

15   leaving the claim in the case for the time being.  Id. at p. 43.

16   I decline to reconsider my ruling at this time, especially

17   when the request to do so is in the context of a Rule 12(b)(6)

18   motion to dismiss and not at summary judgment, or as I indicated

19   previously, not at trial, which I continue to believe is the

20   appropriate time for consideration of the viability of this claim.

21   I deny the City Defendants' motion to dismiss the injunctive relief

22   claim at this time.

23

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

23 - OPINION & ORDER

1                                    CONCLUSION

2          The County Defendants' motion to dismiss and strike (#472) is

3     granted as to the dismissal of certain claims and is denied as to

4     the motion to strike.    The City Defendants' motion to dismiss

5     (#505) is granted in part and denied in part.

6          IT IS SO ORDERED.

7                         Dated this __3rd_day of _November_, 2008.

8

9

10                                   ___/s/ Garr M. King_____
                                     Garr M. King
11                                   United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24 - OPINION & ORDER