1

2

3

4

5

6

7

8

9                  IN THE UNITED STATES DISTRICT COURT

10                    FOR THE DISTRICT OF OREGON

11  JAMES P. CHASSE, JR., et al., )
                                  )
12                 Plaintiffs,    )
                                  )      No.  CV-07-189-HU
13      v.                        )
                                  )
14  CHRISTOPHER HUMPHREYS, et al.,)      OPINION & ORDER
                                  )
15                 Defendants.    )
    _____)

16

17  Tom Steenson
    STEENSON, SCHUMANN, TEWKSBURTY, CREIGHTON & ROSE, P.C.
18  500 Yamhill Plaza Building
    815 S.W. Second Avenue
19  Portland, Oregon 97204

20       Attorney for Plaintiffs

21  James G. Rice
    DEPUTY CITY ATTORNEY
22  David A. Landrum
    DEPUTY CITY ATTORNEY
23  OFFICE OF CITY ATTORNEY
    1221 S.W. Fourth Avenue, Room 430
24  Portland, Oregon 97204

25       Attorneys for City Defendants

26  / / /

27  / / /

28  / / /

1 - OPINION & ORDER

Agnes Sowle
COUNTY ATTORNEY
Susan M. Dunaway
ASSISTANT COUNTY ATTORNEY
501 S.E. Hawthorne Blvd., Suite 500
Portland, Oregon 97214-3587

Robert E. Barton
COSGRAVE VERGEER KESTER, LLP
805 S.W. Broadway
Portland, Oregon 97205

    Attorneys for Bret Burton & Multnomah County

James P. Martin
Kari A. Furnanz
HOFFMAN HART & WAGNER, LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205

    Attorneys for Sokunthy Eath & Patricia Gayman

James L. Dumas
Sheri C. Browning
LINDSAY, HART, NEIL, & WEIGLER LLP
1300 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97201

    Attorneys for AMR Defendants

KING, District Judge:

    In this civil rights action, plaintiffs bring several claims against various defendants, including the City Defendants (Humphreys, Nice, City of Portland, Tri-Met, Potter, and Sizer), the County Defendants (Burton & Multnomah County), the County Nurses (Eath & Gayman)[1], and the AMR Defendants (AMR, Stucker, and Hergert). The claims arise from a September 17, 2006 incident in which James P. Chasse, Jr. (Chasse), died in police custody.

    All of the parties have moved for summary judgment as to certain claims. The only motions remaining at this juncture are

---

    [1] The County Defendants and the County Nurses were dismissed from the case on August 17, 2009.

2 - OPINION & ORDER

1    the motion by plaintiffs against certain AMR Defendants'
2    affirmative defenses and the motion by Hergert and Stucker as to
3    some of plaintiffs' claims.

4       For the reasons explained below, I deny plaintiffs' motion
5    against the AMR Defendants in part, deny it as moot in part, and
6    deny it with leave to renew in part. I grant Hergert and Stucker's
7    motion.

8                    STANDARDS

9       Summary judgment is appropriate if there is no genuine issue
10   of material fact and the moving party is entitled to judgment as a
11   matter of law. Fed. R. Civ. P. 56(c). The moving party bears the
12   initial responsibility of informing the court of the basis of its
13   motion, and identifying those portions of "'pleadings, depositions,
14   answers to interrogatories, and admissions on file, together with
15   the affidavits, if any,' which it believes demonstrate the absence
16   of a genuine issue of material fact." Celotex Corp. v. Catrett,
17   477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

18      "If the moving party meets its initial burden of showing 'the
19   absence of a material and triable issue of fact,' 'the burden then
20   moves to the opposing party, who must present significant probative
21   evidence tending to support its claim or defense.'" Intel Corp. v.
22   Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)
23   (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th
24   Cir. 1987)). The nonmoving party must go beyond the pleadings and
25   designate facts showing an issue for trial. Celotex, 477 U.S. at
26   322-23.

27      The substantive law governing a claim determines whether a
28   fact is material. T.W. Elec. Serv. v. Pacific Elec. Contractors

3 - OPINION & ORDER

1  <u>Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable doubts as

2  to the existence of a genuine issue of fact must be resolved

3  against the moving party. <u>Matsushita Elec. Indus. Co. v. Zenith</u>

4  <u>Radio</u>, 475 U.S. 574, 587 (1986). The court should view inferences

5  drawn from the facts in the light most favorable to the nonmoving

6  party. <u>T.W. Elec. Serv.</u>, 809 F.2d at 630-31.

7      If the factual context makes the nonmoving party's claim as to

8  the existence of a material issue of fact implausible, that party

9  must come forward with more persuasive evidence to support his

10  claim than would otherwise be necessary. <u>Id.</u>; <u>In re Agricultural</u>

11  <u>Research and Tech. Group</u>, 916 F.2d 528, 534 (9th Cir. 1990);

12  <u>California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,</u>

13  <u>Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).

DISCUSSION

15      In their motion for summary judgment, the AMR Defendants move

16  against three claims asserted against them under 42 U.S.C. § 1983[2],

17  as well as statutory disability discrimination claims asserted

18

_____

19      [2] Plaintiffs initially brought three section 1983 claims
against the AMR Defendants: (1) plaintiffs' second claim for
20  relief alleging inadequate medical care in violation of the
Fourth Amendment; (2) plaintiffs' fourth claim for relief
21  alleging unconstitutional "shocks the conscience" conduct in
violation of the Fourteenth Amendment's substantive due process
22  provision; and (3) plaintiffs' fifth claim for relief alleging a
violation of the Equal Protection Clause. In a June 3, 2009
23  Amended Opinion, I granted the AMR Defendants' motion as to the
second claim for relief. However, I then allowed plaintiffs to
24  amend the Complaint by interlineation to add the AMR Defendants
as defendants to plaintiff's third claim for relief, alleging
25  inadequate medical care under the Fourteenth Amendment, separate
from the "shocks the conscience" claim. Essentially, this
26  allowed plaintiffs to move the inadequate medical treatment
allegations against the AMR Defendants from the second to the
27  third claim for relief.
28

4 - OPINION & ORDER

against AMR.   Portions of the AMR Defendants' motion for summary judgment against plaintiffs have been previously resolved.   The following issues remain and presently require resolution:   (1) whether there is "state action" sufficient to allow plaintiffs to proceed with their section 1983 claims against the AMR Defendants; (2) whether plaintiffs have created an issue of fact as to whether the AMR Defendants acted with deliberate indifference; (3) whether plaintiffs have created an issue of fact as to whether the AMR Defendants treated plaintiff differently because of his mental illness in violation of the Equal Protection Clause; and (4) whether the AMR Defendants acted in "good faith" such that they are immune from section 1983 liability.

As to plaintiffs' motion against the AMR Defendants, two of the five affirmative defenses plaintiffs move against overlap with issues raised in the AMR Defendants' motion:   state action and good faith.   The remaining affirmative defenses moved against all concern punitive damages.   These are separately discussed below.

I.   State Action

I address the state action issue first because it is dispositive of the three section 1983 claims brought by plaintiffs against the AMR Defendants.   To prevail in a section 1983 claim, a plaintiff must show the deprivation of a right secured by the Constitution and that the defendant "act[ed] under color of state law."   West v. Atkins, 487 U.S. 42, 48 (1988); 42 U.S.C. § 1983. A section 1983 claim may be brought against a private party when that party "is a willful participant in joint action with the State or its agents."   Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003) (internal quotation omitted).

5 - OPINION & ORDER

As explained in Kirtley:

"The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the [government]?" Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 835 (9th Cir. 1999) (quoting Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)).

"What is fairly attributable [as state action] is a matter of normative judgment, and the criteria lack rigid simplicity.... [N]o one fact can function as a necessary condition across the board ... nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295-96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). Nonetheless, we recognize at least four different criteria, or tests, used to identify state action: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." Sutton, 192 F.3d at 835-36; see also Lee v. Katz, 276 F.3d 550, 554 (9th Cir. 2002). Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists. Lee, 276 F.3d at 554.

Id. (brackets in Kirtley); see also Brentwood Academy, 531 U.S. at 295 (noting that "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'") (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974)).

While technically the "under color of state law" requirement for section 1983 claims is distinct from "state action" required for Fourteenth Amendment claims, "the two inquiries are closely related." Johnson v. Knowles, 113 F.3d 1114, 1118 (9th Cir. 1997); see also George v. Pacific-CSC Work Furlough, 91 F.3d 1227, 1229 (9th Cir. 1996) ("In § 1983 actions, 'color of state law' is synonymous with state action.").

6 - OPINION & ORDER

1    AMR is a private corporation and its employees, Hergert and
2  Stucker, are private citizens.[3]  Plaintiffs argue that section 1983
3  claims may be maintained against these defendants based on the
4  joint action, governmental nexus, or public function tests.  Pltfs'
5  Mem. in Supp. of Pltfs' Mtn. at p. 11.

6    The relevant background facts are undisputed.  American
7  Medical Response is a national medical transportation company that
8  provides emergency medical services throughout the United States.
9  AMR Northwest (AMR), the defendant in this case, is a subsidiary of
10  American Medical Response, Inc. and is registered in and doing
11  business in Oregon.

12    Chapter 682 of the Oregon Revised Statutes regulates the
13  provision of ambulance services in the state.  Plaintiffs cite the
14  Court to two statutes in particular.  First, Oregon Revised Statute
15  § (O.R.S.) 682.041 sets forth the legislature's intent that the
16  regulation of ambulance services and the establishment of ambulance
17  service areas are important functions of counties, cities, and
18  rural fire protection districts in the state.  O.R.S. 682.041.  The
19  legislature affirms the authority of counties, cites, and rural
20  fire protection districts to regulate ambulance services and areas
21  and to exempt such regulation from liability under federal
22  antitrust laws.  Id.

23    Second, plaintiffs cite to O.R.S. 682.062 which requires each
24  county to develop a plan relating to the need for and coordination
25  of ambulance services and to establish one or more ambulance

26

27    [3]  Although the claims against AMR have been bifurcated, the
28  conclusion reached on the state action issue for individual
   defendants Hergert and Stucker is equally applicable to AMR.

7 - OPINION & ORDER

service areas consistent with the plan for the efficient and
effective provision of ambulance services. O.R.S. 682.062(1). Any
plan developed and any service areas established under O.R.S.
682.062(1) must be submitted to the Oregon Health Authority.
O.R.S. 682.062(4). The Oregon Health Authority is required to
adopt rules that specify those subjects to be addressed and
considered in any plan for ambulance services under subsection (1)
and those subjects to be addressed and considered in the adoption
of any such plan. O.R.S. 682.062(5). The Oregon Health Authority
reviews plans submitted to it and is required to approve a
submitted plan within sixty days, if the plan complies with the
rules. O.R.S. 682.062(6).

Multnomah County's "Emergency Medical Services and Ambulance
Law" is found at Multnomah County Code §§ 21.400 - 21.443. Pltfs'
Exh. 8. Under Multnomah County Code § 21.425, the exclusive
provider of emergency ambulance services in the County is to be
selected by the Multnomah County Board of Commissioners through a
competitive proposal process. Under section 21.402, Multnomah
County EMS (MCEMS) is defined as the organizational division
responsible for the administration and coordination of the EMS
system in the County. M.C.C. § 21.402. "EMS" is separately
defined as pre-hospital functions and services whose purpose is to
prepare for and respond to medical emergencies, including rescue,
first responder services, ambulance services, patient care,
communications, system evaluation, and public education. M.C.C. §
21.402. Generally, MCEMS provides medical oversight and overall
coordination of the County's EMS system. MCEMS is a program of the
County's Health Department, and is recognized by the Oregon Health

8 - OPINION & ORDER

Division as the EMS medical control authority for the County.  See
Pltfs' Exh. 3 (copy of County webpages related to the EMS System).

The County's EMS Medical Director provides medical supervision
to emergency medical technicians (EMTs) and provides medical
direction to the EMS system.  M.C.C. § 21.402.  The County's
January 2005 Request for Proposal for Emergency Ambulance Services
states that the successful contractor will be responsible for
adhering to the EMS Medical Director's policies, participating in
the Medical Director's audit and Quality Improvement processes, and
participating in medically-related research as deemed appropriate.
Pltfs' Exh. 4 at p. 5.  The Medical Director will serve as the
physician supervisor of record for all pre-hospital EMTs.  Id.

The duties of the County's EMS Medical Director include the
following:  (1) approving all EMTs for practice; (2) creating
policies for limiting the practice of EMTs when necessary,
including adequate due process protections for EMTs; (3) setting
standards for training and continuing education; (4) implementing
a quality management program designed to provide for the continuous
improvement of patient care and other aspects of the EMS system;
and (5) promulgating standards of patient care, consistent with the
ambulance service area plan, and including, but not limited to:
dispatch and pre-arrival protocols, transport triage criteria and
protocols, specific requirements for EMTs working within the
county, and patient care protocols.  M.C.C. § 21.417.

The County employs Dr. Jon Jui as its EMS Medical Director.
He is not an employee of AMR.  Under the September 1, 2005
agreement between AMR and the County regarding the provision of
emergency ambulance services, the County agreed to furnish "state-

9 - OPINION & ORDER

required medical supervision" as well as "overall supervision and administration" of the agreement and the County quality assurance process. Pltfs' Exh. 5 at p. 14.  The County charges AMR for supervision and a portion of the amount charged is used to partially fund the County's EMS Medical Director.  Id.

The contract between AMR and Multnomah County sets certain specific responsibilities for AMR including response time zones and standards, penalties for non-compliance with the County's response time requirements, staffing, driver training, vehicle and equipment requirements, patient care reports and data collections, and more. Pltfs' Exh. 5.

A.  Public Function

"Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." Lee, 276 F.3d at 554-55 (internal quotation marks omitted).  The public function test is satisfied only on a showing that the function at issue is "both traditionally and exclusively governmental." Id. at 555.

Kirtley, 326 F.3d at 1093; see also Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982) ("the question is whether the function performed has been traditionally the exclusive prerogative of the State. . . . That a private entity performs a function which serves the public does not make its acts state action.") (citations and internal quotation omitted).  The scope of the public function doctrine is relatively narrow. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 158 (1978) ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the state.'") (quoting Jackson, 419 U.S. at 352).

The Ninth Circuit has not directly addressed the issue of

10 - OPINION & ORDER

whether the provision of emergency services is a public function.
Other courts have concluded that as a matter of law, the provision
of emergency services is not a traditional and exclusive function
of the state.    E.g., McKinney v. West End Voluntary Ambulance
Ass'n, 821 F. Supp. 1013, 1018-19 (E.D. Pa. 1992) (private
ambulance association was not a state actor under public function
test; plaintiff failed to establish that ambulance service is
traditionally the exclusive prerogative of the Commonwealth); see
also Krieger v. Bethesda-Chevy Chase Rescue Squad, 599 F. Supp.
770, 773 (D. Md. 1984) (rescue or ambulance service is not a public
function), aff'd without opinion, 792 F.2d 139 (4th Cir. 1986);
Eggleston v. Prince Edward Volunteer Rescue Squad, Inc., 569 F.
Supp. 1344, 1350-51 (E.D. Va. 1983) (Emergency transportation
services are "more akin to private functions that the State may be
just beginning to assume than to public functions that are
traditionally governmental."), aff'd without opinion, 742 F.2d 1448
(4th Cir. 1984).

    The only evidence in the record regarding the history of the
Multnomah County Code sections directed to emergency medical
services is the following parenthetical history noted at the end of
each relevant code section:   "('90 Code, § 6.33.005, 7/01/1998;
Ord. 816, passed 04/06/1995)."   While somewhat ambiguous, it is
clear enough that the County's first adoption of laws regulating
emergency medical services was no earlier than 1990.   This is not
evidence of a traditional governmental function.

    The state statutes also are relatively recent.    The
legislative intent expressed in O.R.S. 682.041, and cited by
plaintiff, appears to have been originally adopted in 1989.   See

11 - OPINION & ORDER

1   O.R.S. 682.041 (indicating this statute was formerly codified at
2   O.R.S. 682.315; O.R.S. 682.315 indicates it was formerly codified
3   at O.R.S. 823.300; O.R.S. 823.300 indicates that it was adopted in
4   1989).  The statute requiring the counties to adopt an ambulance
5   service plan was originally adopted in 1977.  See O.R.S. 682.062
6   (indicating this statute was formerly codified at O.R.S. 682.205;
7   O.R.S. 682.205 indicates it was formerly codified at O.R.S.
8   823.180; O.R.S. 823.180 indicates it was formerly codified at
9   O.R.S. 485.573, which indicates it was adopted in 1977).

10      Plaintiffs submit no evidence showing that either the state or
11  the County itself has traditionally and exclusively provided
12  emergency medical services.  Plaintiffs also submit no evidence to
13  support their assertion that either the state or Multnomah County
14  has a long history of regulating and supervising such services.  It
15  appears that the regulatory oversight by the state is only several
16  decades old, at most, and the regulatory oversight by the County is
17  more recent.  With no controlling authority in the Ninth Circuit,
18  and the persuasive authority indicating that in those courts that
19  have considered it, provision of emergency medical services is not
20  an exclusive and traditional public function, I conclude that the
21  AMR Defendants are not state actors under the public function test.

22      B.  Joint Action/Governmental Nexus

23      State action/under color of state law cases often describe
24  "joint action" and "governmental nexus" as separate tests.
25  However, some cases discuss them together. For example, in Jensen
26  v. Lane County, 222 F.3d 570 (9th Cir. 2000), the Ninth Circuit
27  described its analysis as the "close nexus/joint action test." Id.
28  at 575; see also Brentwood Academy, 531 U.S. at 298 (not using

12 - OPINION & ORDER

either term but discussing the "pervasive entwinement" of public institutions and officials in the composition and workings of the defendant private association).

As for "joint action," the Ninth Circuit explains that

> [u]nder the joint action test, courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights. . . . The test focuses on whether the state has so far insinuated itself into a position of interdependence with the private actor that it must be recognized as a joint participant in the challenged activity. . . . A plaintiff may demonstrate joint action by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents. . . . To be liable as co-conspirators, each participant in a conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. . . . [A] private defendant must share with the public entity the goal of violating a plaintiff's constitutional rights.

Franklin v. Fox, 312 F.3d 423, 445 (9th Cir. 2002) (citations, internal quotations, and brackets omitted) (further noting that "[o]ur cases have been careful to require a substantial degree of cooperation before imposing civil liability for actions by private individuals that impinge on civil rights."); see also Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989) ("Joint action . . . requires a substantial degree of cooperative action.").

As for the governmental nexus "test," Kirtley describes the governmental nexus test as the "most vague of the four approaches." Kirtley, 326 F.3d at 1094. "[T]he nexus test asks whether 'there is such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself.'" Kirtley, 326 F.3d at 1094-95 (quoting Brentwood, 531 U.S. at 295); see also Jackson, 419 U.S. at 351 ("the inquiry must be whether there is a sufficiently close nexus

13 - OPINION & ORDER

1  between the State and the challenged action of the regulated entity
2  so that the action of the latter may be fairly treated as that of
3  the State itself.").

4      Plaintiffs here do not rely on a conspiracy theory in support
5  of their joint action argument.  They also do not contend, in
6  support of their state action argument, that the alleged wrongful
7  conduct by the AMR Defendants was inextricably intertwined with the
8  conduct of the officers at the scene of Chasse's arrest and thus,
9  is joint action for that reason.  Rather, plaintiffs argue that the
10 exclusive contract between AMR and the County and its particular
11 performance requirements, including the supervision of the EMTs by
12 the County's EMS Medical Director and the EMS Medical Director's
13 issuance of patient care protocols, as well as the extensive
14 government regulation of ambulance services, shows "joint action."

15     Initially, I reject plaintiffs' reliance on <u>Lopez v.</u>
16 <u>Department of Health Servs</u>, 939 F.2d 881 (9th Cir. 1991).  <u>Lopez</u>
17 holds only that pleading the existence of a government contract is
18 enough to survive a motion to dismiss on the issue of state action.
19 <u>Id.</u> at 883.  Supreme Court cases make clear that neither a
20 government contract, nor government regulation, establishes state
21 action in the face of a summary judgment motion.  <u>E.g.</u>, <u>American</u>
22 <u>Mfs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 57 (1999) (noting that
23 the Court's line of "joint action" cases has "established that
24 privately owned enterprises providing services that the State would
25 not necessarily provide, even though they are extensively
26 regulated, do not fall within the ambit of [joint action].")
27 (internal quotation omitted); <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004
28 (1982) ("although it is apparent that nursing homes in New York are

14 - OPINION & ORDER

extensively regulated, the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.") (internal quotation omitted); Rendell-Baker, 457 U.S. at 841 (noting that "[a]cts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.").

In assessing the plaintiffs' state action argument, it is important to note that all three section 1983 claims brought against the AMR Defendants are based on the allegation that Hergert and Stucker acted unreasonably in regard to Chasse's medical needs in one or more of the following ways: (1) by failing to take an adequate and complete history of the nature and cause of Chasse's injuries; (2) by failing to determine the cause and mechanism of his injuries, including his cessation of breathing and unconsciousness; (3) by failing to perform a complete and thorough physical exam; (4) by failing to thoroughly assess Chasse's respiratory status; (5) by failing to take adequate and accurate vital signs; (6) by failing to determine the cause and to treat the condition causing blood to drain from Chasse's mouth; (7) by failing to turn over the care of Chasse to a person of higher medical skill; and (8) by failing to follow the Multnomah County Emergency System protocols, as well as AMR's own protocols, applicable to someone in Chasse's condition. Am. Compl. at ¶ 33.

The relevant cases, including Blum, Polk County v. Dodson, 454 U.S. 312 (1981), and Jensen, indicate that although Multnomah County regulates ambulance services in the County, and provides oversight, supervision, and protocols, each of the alleged

15 - OPINION & ORDER

1   unconstitutional actions by Hergert and Stucker were individual
2   actions based on their professional judgment and assessment at the
3   scene. Contrary to plaintiffs' argument, the County's regulation
4   of AMR does not intrude into the individual actor's professional
5   decisionmaking rendered in the course of duty.

6        In <u>Blum</u>, a class of Medicaid patients challenged decisions by
7   the nursing homes in which they resided, to discharge or transfer
8   them without notice or an opportunity for a hearing. <u>Blum</u>, 457
9   U.S. at 993. The question before the Supreme Court was whether the
10  state could be held responsible for those decisions under the
11  Fourteenth Amendment's Due Process Clause. <u>Id.</u>

12       The Court restated concepts from its earlier cases, including
13  that "the mere fact that a business is subject to state regulation
14  does not by itself convert its action into that of the State for
15  purposes of the Fourteenth Amendment." <u>Id.</u> at 1004 (internal
16  quotation omitted). The Court further noted that "constitutional
17  standards are invoked only when it can be said that the State is
18  <u>responsible</u> for the specific conduct of which the plaintiff
19  complains." <u>Id.</u>

20       The Court concluded that the state was not responsible for the
21  nursing homes' decisions to transfer, or not admit, Medicaid
22  patients. <u>Id.</u> at 1007. Although state regulations required
23  nursing homes to make all efforts possible to transfer patients to
24  the appropriate level of care or home as indicated by the patient's
25  medical condition or needs, and although the nursing homes were
26  required to complete patient care assessment forms designed by the
27  state, the regulations did not require the nursing homes to rely on
28  the forms in making discharge or transfer decisions, and did not

16 - OPINION & ORDER

1  demonstrate that the state was responsible for the decision to
2  discharge or transfer particular patients.    Id. at 1008.
3  Critically, as the Court noted, "[t]hose decisions ultimately turn
4  on medical judgments made by private parties according to
5  professional standards that are not established by the State." Id.
6  (emphasis added).

7      In Polk County, the Court considered whether a public
8  defender, directly employed by the County, was acting under color
9  of state law when she moved to withdraw as counsel on the basis
10 that the plaintiff's appellate claims were legally frivolous.  The
11 attorney acted pursuant to a state rule of appellate procedure
12 which provided that if counsel appointed to represent a convicted,
13 indigent defendant in an appeal to the state supreme court was
14 convinced, after investigation of the trial transcript, that the
15 appeal was frivolous, counsel could move in writing to withdraw.
16 Polk County, 454 U.S. at 314 n.2.

17     Although the attorney was a County employee, and acted
18 pursuant to the rules and procedures adopted by the state and the
19 County regarding representation of indigent clients in criminal
20 appeals, the Supreme Court concluded that the attorney was not
21 acting under color of state law.  The Court relied heavily on the
22 fact that the attorney was held to the "same standards of
23 competence and integrity as a private lawyer," and worked "under
24 canons of professional responsibility that mandate his exercise of
25 independent judgment on behalf of the client." Id. at 321.

26     In contrast to Blum and Polk County where the challenged
27 conduct of the private actors was in fact guided by independent
28 professional standards, the Ninth Circuit in Jensen concluded that

17 - OPINION & ORDER

the challenged conduct there was the product of a "deeply intertwined" public and private process, and thus, there was sufficient state action.    In <u>Jensen</u>, the plaintiff brought a section 1983 claim against Lane County, certain officials, a hospital, and a private physician in connection with the plaintiff's mental health detention.    <u>Jensen</u>, 222 F.3d at 573.    The plaintiff was arrested and booked at the Lane County adult corrections facility.    Two days later, Richard Sherman, a senior mental health specialist employed by Lane County, received information reporting concerns about the plaintiff's behavior. After reviewing certain documents and meeting the plaintiff, Sherman concluded that probable cause existed to believe that the plaintiff was a danger to himself or others.    Sherman, believing he had a statutory duty to do so, brought the case to the attention of Dr. Jeffery Robbins, M.D., a contract psychiatrist affiliated with a private group called Psychiatric Associates (PA).    Sherman also consulted with Dr. Ekanger, a senior mental health specialist employed by Lane County.

Sherman recommended that the plaintiff be held at Lane County Psychiatric Hospital for evaluation.    Dr. Robbins signed an order detaining the plaintiff for evaluation pursuant to O.R.S. 426.232. The next day, Dr. Robbins took a history and performed a physical. He continued the plaintiff's detention, meeting briefly with him each of the next three days.    Meanwhile, Dr. Ekanger conducted an investigation to determine whether to pursue statutory involuntary commitment proceedings before the court.    Dr. Ekanger and Dr. Robbins then agreed that the plaintiff should be released.

The plaintiff filed a section 1983 action alleging that Dr.

18 - OPINION & ORDER

1  Robbins and the other named defendants had violated his
2  constitutional rights by ordering him admitted to the psychiatric
3  hospital without due process of law.  Id.  Because Dr. Robbins was
4  a private individual, the court had to determine if the plaintiff
5  could sustain the section 1983 claim against him.

6      The court first noted that because the case before it combined
7  private actors and government officials, other cases which had
8  found no state action when purely private actors obtained the help
9  of a private physician to bring about the involuntary admission and
10 detention of an allegedly mentally ill person, were not
11 controlling.  Id. at 574.

12     The court then explained that Dr. Robbins relied on Blum to
13 argue that there was no state action:

14          Dr. Robbins asserts that Blum is directly analogous.
       He argues that, by contract and in practice, it is the
15     committing physician that must make the medical judgment
       under which a person is detained for a psychiatric
16     evaluation.  Indeed, the statutory obligation of the
       physician is to order the detention of those persons whom
17     he or she believes to be a danger to self or others. . .
       . The service contract and [the psychiatric hospital's]
18     policies both anticipate that the psychiatrist on call
       will exercise clinical judgment.  The real issue here is
19     whether the state's involvement in the decision-making
       process rises to a level that overrides the "purely
20     medical judgment" rationale of Blum.

21 Id. at 575 (footnote omitted).

22     Although the Ninth Circuit rejected Blum as "not controlling,"
23 it cited familiar precepts from Blum and Jackson in recognizing
24 that "detailed regulation of and substantial funding for private
25 actors are not sufficient to transform the party's conduct into
26 state action" and that "the State must be so far insinuated into a
27 position of interdependence with the private party that it was a
28 joint participant in the enterprise."  Id. (citing Blum, 457 U.S.

19 - OPINION & ORDER

1  at 1011; quoting <u>Jackson</u>, 419 U.S. 357-58) (brackets omitted).

2      The court then concluded that Dr. Robbins's conduct
3  constituted state action.  The court explained that

> Dr. Robbins and the County through its employees have
> undertaken a complex and deeply intertwined process of
> evaluating and detaining individuals who are believed to
> be mentally ill and a danger to themselves or others.
> County employees initiate the evaluation process, there
> is significant consultation with and among the various
> mental health professionals (including both PA
> psychiatrists and county crisis workers), and PA helps to
> develop and maintain the mental health policies of [the
> psychiatric hospital].  We are convinced that the state
> has so deeply insinuated itself into this process that
> there is a sufficiently close nexus between the State and
> the challenged action of the defendant so that the action
> of the latter may be fairly treated as that of the State
> itself.

12  <u>Id.</u> (internal quotation omitted).

13      In contrast to <u>Jensen</u>, the facts in the instant case require
14  a determination of no state action.  While state statutes regulate
15  some aspects of emergency medical services, and the Multnomah
16  County Code addresses the provision of such services in Multnomah
17  County, there is no evidence in this record demonstrating that the
18  EMTs in the field rely on anything but their individual
19  professional judgment to assess a situation and then determine the
20  appropriate course of action.

21      Dr. Jui's status as the medical director and his issuance of
22  various protocols do not show that the "State [or County] is
23  <u>responsible</u> for the specific conduct of which the plaintiff
24  complains." <u>Blum</u>, 457 U.S. at 1004.  I see nothing in the County's
25  regulations or protocols that dictate the EMTs' provision of
26  medical care.  Additionally, despite the references to patient care
27  protocols, in the plural, the summary judgment record contains a
28  copy of only one protocol.  Plaintiffs' Exhibit 7 is a copy of

20 - OPINION & ORDER

1    protocol addressing a "Non-Transport Procedure." Pltfs' Exh. 7.
2    It is entitled "Refusal and Informed Consent Flow Chart." <u>Id.</u>
3    Notably, the first step in the flow chart requires the EMTs to
4    "Assess Patient's Medical Need." <u>Id.</u>  Other boxes in the flow
5    chart require the assessment of whether there is a sign of
6    traumatic injury, whether there is an identifiable behavior
7    problem, whether there is normal mental status, and then, whether
8    there is an ability to make decisions. <u>Id.</u>

9         Nothing in the flow chart sets forth the process by which the
10   EMTs render their evaluations or observation of medical need,
11   traumatic injury, behavior problems, mental illness, or ability to
12   make decisions.  Rather, these are professional assessments made
13   using the EMT's education, training, and experience.  They are not
14   mandated by the County's protocol, which is essentially a
15   procedural protocol, and which does not supplant the use of
16   independent professional judgment according to national standards
17   for paramedic practice. <u>See</u> Declaration of Plaintiffs' Expert Paul
18   Werfel at ¶ 2 (Pltfs' Exh. 96) (noting that he is familiar with the
19   standards which apply to paramedic medicine and that these are
20   national standards).

21        <u>Jensen</u> is distinguishable.  Here, the County was not involved
22   in the actual decisions of the EMTs that are challenged in this
23   case.  In contrast, Dr. Robbins and Lane County employees worked
24   together as a team to determine whether the plaintiff in <u>Jensen</u>
25   should be detained.  While Dr. Robbins employed his own
26   professional medical judgment, the detention decision was the
27   product of an evaluation and commitment process involving both
28   county employees and Dr. Robbins.  Thus, the Ninth Circuit readily

21 - OPINION & ORDER

1  concluded that the private and public actors engaged in a "deeply

2  intertwined process" which overrode the "'purely medical judgment'

3  rationale of Blum." Jensen, 222 F.3d at 575.

4       Here, the evidence fails to establish that the County is

5  responsible for the specific conduct of which plaintiffs complain.

6  While the protocols establish procedures and guidelines for the

7  provision of care, there is no evidence that they create a

8  substitute for the independent professional medical judgment

9  exercised by the EMTs in their treatment of Chasse. The facts here

10 do not support an "override" of Blum's independent medical judgment

11 rationale. Rather, Blum and Polk County indicate that there is no

12 state action and that the EMTs were not acting under color of state

13 law.

14      It is important to recognize that this conclusion does not end

15 the case against AMR. Plaintiffs still have a statutory disability

16 discrimination claim against AMR, and importantly, a wrongful death

17 claim, based on the same allegations as the section 1983 claims.

18 My conclusion here is only that the private actor AMR Defendants

19 may not be held responsible for constitutional violations. I make

20 no judgment on the viability of the remaining claims against AMR.

21      I grant summary judgment to the AMR Defendants on plaintiffs'

22 third, fourth, and fifth claims for relief. I do not address the

23 remaining arguments raised by the AMR Defendants' summary judgment

24 motion. I deny plaintiffs' motion for summary judgment as to the

25 affirmative defense of state action. I deny as moot plaintiffs'

26 motion for summary judgment on the affirmative defense of good

27 faith.

28 / / /

22 - OPINION & ORDER

1  II.  Remaining Issues in Plaintiffs' Motion

2       In their Answer to the Amended Complaint, the AMR Defendants

3  assert three affirmative defenses regarding punitive damages.  In

4  response to plaintiffs' summary judgment motion, the AMR Defendants

5  withdraw two of them:  the tenth affirmative defense asserting that

6  punitive damages are unconstitutional as a violation of double

7  jeopardy and the eleventh affirmative defense asserting that

8  punitive damages are unconstitutional as a violation of the ex post

9  facto clause.  In light of the withdrawal, I deny plaintiffs'

10 motion as to these affirmative defenses as moot.

11      In their ninth affirmative defense, the AMR Defendants assert

12 that punitive damages are unconstitutional as a violation of due

13 process.  I deny plaintiffs' motion against this affirmative

14 defense, with leave to renew, if appropriate.

15                           CONCLUSION

16      The AMR Defendants' motion for partial summary judgment (#661)

17 is granted as to the section 1983 claims.  Plaintiffs' summary

18 judgment motion against the AMR Defendants' Affirmative Defenses

19 (#635) is denied in part, denied as moot in part, and denied with

20 leave to renew in part.

21      IT IS SO ORDERED.

22                 Dated this  13th day of  October   , 2009.

23

24

25                          /s/ Garr M. King
                      _____
26                          Garr M. King
                            United States District Judge

27

28

23 - OPINION & ORDER